Earl A. FREDERICK, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–92–1111.

Court of Criminal Appeals of Oklahoma.

Aug. 30, 1995.

Bert Richard, Oklahoma City, for appellant at trial.

Sandra Stensaas and Susan Palmer, Oklahoma City, for the State at trial.

Wendell B. Sutton, Assistant Public Defender, Oklahoma City, for appellant on appeal.

Susan Brimer Loving, Attorney General of Oklahoma and William L. Humes, Assistant Attorney General, Oklahoma City, for appellee on appeal.

## OPINION

STRUBHAR, Judge:

Appellant, Earl Frederick, was charged with First Degree Murder, in violation of 21 O.S.1991, § 701.7, in the District Court of Oklahoma County, Case No. CF-90-734. The State filed a Bill of Particulars alleging two aggravating circumstances: that the murder was committed for the purpose of avoiding arrest or prosecution, and that Appellant constituted a continuing threat to society. The jury found Appellant guilty of the crime charged and found one aggravating circumstance to exist, that of continuing threat to society. Appellant was sentenced to death. From this judgment and sentence he has perfected his appeal to this Court.

During November of 1989, Bradford Beck lived in the home of his cousin, Terri Smith, in Spencer, Oklahoma, while Smith was out of state visiting her mother. As early as November 7, 1989, witnesses testified that a man known as "Jeff" began staying with Beck in Smith's house.[1] On November 7, 1989, Smith called Beck to see if her food stamps had arrived. During this telephone call she heard music and was told by Beck that they were partying and having a nice time. Beck told her that "Jeffery" was one of the people there. Smith called Beck again on the morning of November 11, 1989. Beck told Smith during this conversation that he was mad at "Jeffery" and was going to take him back to Shawnee. Smith tried to call Beck several times after November 11 but no one answered the telephone. She became concerned because it was unlike Beck to leave for significant periods of time without letting anyone know where he was going.

Bobby Hollingshad was good friends with Beck. During the time that Beck had stayed in Smith's house, Hollingshad had seen "Jeff" at the house with Beck several times. On November 11, 1989, Hollingshad saw Beck and "Jeff" drinking and smoking marijuana at Smith's house. He had heard them arguing when he approached the house but they stopped when he knocked on the door and

entered. When it was getting dark outside, Hollingshad left Smith's house and went across the street to his father's house. Later that evening, Hollingshad saw someone walk out to Beck's truck and start it. He did not believe this person was Beck because Beck walked with a noticeable limp and this person did not. The person then went back into the house. Later the pickup was driven away. Hollingshad testified that Beck was very proud of his truck and he rarely let anyone use it.

Jack Weese, a friend of Beck's, first noticed "Jeff" at Smith's house with Beck on November 7, 1989. A few days after November 11, 1989, Weese went back to Smith's house. He noticed that no one was there and Beck's pickup was not around. He went into the house and observed that one bedroom was in disarray. Human blood was found on the floor furnace.

It was subsequently discovered by the police that Appellant had checked into a motel in Dumas, Texas, on November 11, 1989, under the name of Larry Davis. He had been driving Beck's pickup at this time.

On November 16, 1989, a pickup later identified as that belonging to Beck was found in Texline, Texas. There was blood in the pickup on the seat, driver's door and ignition. Several items belonging to Beck and Smith were found in the pickup. Beck's cane, glasses and glove were found a short distance away, in Thompson's Grove.

At approximately 11:40 p.m. on November 19, 1989, Patrolman Oakley of the Amarillo, Texas Police Department observed a car matching the description of one stolen from a person found murdered in Texline, Texas.[2] Oakley and another officer stopped the vehicle which was occupied by a woman and a young child. The woman told the police officers that she had borrowed the car from a man named R.J. whom she had met in a bar a couple of nights earlier. The woman gave the police a description of the man and told them that he could be found at the Unique

---

1. At trial, several witnesses identified Appellant as the person known to them as "Jeff."

2. The information regarding the murder of the stolen car's owner was disclosed *in camera* but not revealed to the jury during the first stage proceedings.

Club. The officers proceeded to the Unique club where they arrested Appellant, who matched the description given by the woman in the car. Appellant identified himself to the police as Earl Alexander Frederick. The car that the woman had been driving was secured and searched. Inside it the police found a pair of coveralls belonging to Bradford Beck.

While in custody immediately after his arrest, Appellant was booked into jail and advised of his *Miranda* [3] rights. He was then questioned by Officer Oakley about the car which had led to his arrest. Oakley discovered that Appellant was checked into a motel room in Amarillo. Appellant gave the police consent to search this motel room which he was checked into under the name of Larry Davis. In this motel room the police found numerous items belonging to Beck and Smith.

At about 3:00 a.m. on November 20, 1989, Appellant was advised of his rights under *Miranda* and questioned by Criminal Investigator Tim Bell. During this interview, Appellant told Bell that he and Beck had planned to go to New Mexico where Beck was going to visit his sister in Albuquerque and Appellant was going to make contact with an ex-wife. However, before they left, Beck changed his mind and told Appellant to take the pickup and leave without him. Appellant said that Beck told him that he was going to hitchhike to Old Mexico and drop off the face of the earth.

The following day, November 21, 1989, at approximately 4:30 p.m., Bell interviewed Appellant again. Bell again apprised Appellant of his *Miranda* rights before questioning him. On this occasion, Appellant identified himself as Earl Alexander Frederick, Sr. He told Bell that he had driven Beck's truck from Oklahoma City to Dumas where he had spent the night in a motel. Appellant had checked into this motel under the name of Larry Davis. Appellant also told Bell that on another night he had stayed in a motel in

Dalhart, Texas. Appellant had checked into this motel under the name of R.J. Collier.

At about 6:00 p.m. on that same day, November 21, 1989, Bell returned to the jail after having been advised that Appellant wanted to speak with him again. At this time, Appellant told Bell that his name was Larry Davis and he needed to speak quickly because "Jeff" didn't let him out very long. Bell asked who "Jeff" was, and "Larry" responded, "Jeff is the one that controls Earl, R.J. and Larry and makes them do things that they don't want to do." [4] "Larry" advised Bell that Earl had lied to him earlier and that "Jeff" had killed Beck and had dumped his body in an open field near Spencer, Oklahoma. During this interview, "Larry" had been crying. At one point, he quit crying, sat a minute and kind of shook. He looked down at the floor and then looked at Bell and the Sheriff and said, "who are you?" [5] Bell responded by asking who he was, and he replied that his name was "R.J. Forrester." [6] Then "R.J." asked where he was and Bell told him. Bell walked him back to his cell and as they were walking, "R.J." stopped, looked at Bell and said, "you're Tim." Bell responded that he was, and "R.J." then said, "I'm Jeff, I've heard about you." [7] This was the end of the conversation.

On January 15, 1990, Beck's partially decomposed body was found in a field by some deserted buildings not far from Smith's house. The medical examiner testified that he listed the cause of death as undetermined—head trauma. He classified the manner of death as homicide because he did not believe that the skull injuries were caused by a fall or other accidental event.

Appellant was charged with Beck's murder and the case was first set for trial on June 24, 1991, but pursuant to the request of both parties, was continued until November 18, 1991. A Scheduling Order entered on November 13, 1991, reflects that the trial date was again continued by agreement of both parties until January 13, 1992. In January

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Trial Transcript III, 33.

5. Trial Transcript III, 36.

6. Trial Transcript III, 37.

7. Trial Transcript III, 37.

of 1992, defense counsel filed an application for a stay of the proceedings stating therein that the defendant had earlier sought from the court a finding that an expert in forensic psychiatry/psychology was necessary. It was noted in this application that the court had determined such an expert to be necessary to the defendant but because the Indigent Defense System was without adequate funds at that time, an expert could not be immediately procured. Accordingly, defense counsel requested the case be stayed until sufficient funds became available to hire the necessary expert. On January 3, 1992, the trial court granted defense counsel's application and continued the trial until April 13, 1992.

On April 2, 1992, the court conducted an *ex parte* hearing with defense counsel concerning the mental competency of Appellant.[8] It was established at this hearing that defense counsel had been advised that money was available for an expert and accordingly, had hired a clinical psychologist, Dr. Philip Murphy, to examine Appellant. Dr. Murphy testified at the hearing that he had spent three hours interviewing and testing Appellant.[9] After analyzing the interview and test results, Murphy concluded there was a possibility Appellant suffered from Multiple Personality Disorder (MPD). Dr. Murphy also noted the test indicators did not show Appellant lied or tried to fake his responses. However, Dr. Murphy testified that while the facts pointed toward MPD, it was a rare disorder that he had only seen once in twenty-two years of clinical experience, and accordingly, would require extended evaluation by a psychiatrist to accurately diagnose. Dr. Murphy advised the court that such evaluation would call for someone who was an expert in the area and had multiple experiences with this particular disorder. He specifically stated that he was not such an expert. He further noted that due to the rarity of the disorder,

he was not aware of any such experts in the area. Based upon this hearing and defense counsel's expressed need for additional time to secure a competent expert in the area of MPD, the judge continued the trial until October 5, 1992.[10]

The record reflects no further mention of defense counsel's attempt to secure a competent expert witness until September 25, 1992, when defense counsel argued, *in camera*, a supplemental motion for continuance. The motion advised the trial court that defense counsel had retained the services of Dr. Bennett G. Braun, a renowned expert in the field of Multiple Personality Disorder. However, due to a pre-existing professional commitment, Dr. Braun was unable to test, examine, and evaluate Appellant until the latter part of November 1992. The motion also noted that if granted the additional time necessary for Dr. Braun to examine Appellant, Dr. Braun could complete the process and be prepared to render an opinion within three days. The judge denied the motion for continuance stating that trial had been put off several times and he did not feel that he could delay it any longer. The order issued by the trial court denying the motion gave no further basis for this decision.

■ Appellant argues in his first proposition that the trial court's denial of his motion for continuance on September 25, 1989, constituted an abuse of discretion as it forced him to trial without the benefit of his due process right to evaluation by a competent psychiatrist as is provided by *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Accordingly, he contends said ruling prevented his attorney from effectively representing him, thus in effect, denying his right to counsel. The State counters by asserting that the trial court did not abuse its discretion in denying the motion for continuance. It is the State's position that defense counsel was not entitled to a continu-

8. The hearing of April 2, 1992, was held pursuant to *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Further, in keeping with the intention of the majority of the *Ake v. Oklahoma* Court, the evidentiary hearing was appropriately held *ex parte*. See *McGregor v. State*, 733 P.2d 416 (Okl.Cr.1987).

9. Dr. Murphy administered to Appellant the Minnesota Multi–Phase Personality Inventory—2 Test (MMPI–2) and a Rorschach Test.

10. This order set forth that by agreement of the parties, the continuance would toll any speedy trial claims of Appellant's for the stated period of time.

ance because he had not demonstrated due diligence in his attempt to secure a competent psychiatrist in a timely manner.

The United States Supreme Court held in *Ake* that, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. In the current case, the trial court found Appellant had made the requisite showing under *Ake* to entitle him to the assistance of a competent psychiatrist. This ruling has not been challenged by either party, and indeed, that Appellant made the requisite showing of need is amply supported by the record. Accordingly, whether Appellant was entitled to the assistance of a competent psychiatrist is not at issue. Equally clear is that Appellant was denied his due process right to the assistance of a competent psychiatric expert.

While the record is not complete enough to direct the blame for this error at any one party, it clearly demonstrates a breakdown in the adversarial process in this case. There is no indication from the record as to when Dr. Braun was actually retained by defense counsel. It is also vague as to the extent of defense counsel's attempt to secure a competent expert who could have evaluated Appellant in a more timely manner. If in fact defense counsel was having difficulty procuring a qualified psychiatric expert, he should have advised the trial court of his attempts to do so in a timely manner and of his difficulties in achieving this goal. This would have reflected on the record defense counsel's diligence in this endeavor.

On the other hand, if as the State argues, defense counsel did not act diligently in his attempt to secure his expert, the prosecutor could and should have made an attempt to put this want of diligence on the record at the hearing on the motion for continuance. Alleging that defense counsel was not enti-

tled to a continuance because he had not made diligent attempts to secure his expert in a timely fashion would have forced defense counsel to defend his actions and would have given the State something upon which to base its argument on appeal, if appropriate.

Finally, it is worthy of notation that the United States Supreme Court in *Ake v. Oklahoma* held only that criminal defendants must be provided the assistance of experts under certain circumstances, it did not proffer a required method of providing such. The Supreme Court specifically stated, "we leave to the States the decision on how to implement this right." *Ake v. Oklahoma,* 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. Accordingly, if the trial court had inquired early on and found that defense counsel was 'expert shopping' or simply not attempting to secure an expert, the judge may have opted to secure a competent expert for the Appellant.

■ Having discussed the possible actions that could have been taken by those involved to prevent this error, we are still left with the fact that this constitutional error occurred and our focus must now turn to a determination of whether this due process violation vitiates the judgment against Appellant. It is well settled that not all errors of constitutional magnitude require automatic reversal. The United States Supreme Court noted in *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967), that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." However, there are some constitutional errors to which a harmless error analysis cannot be applied. For instance, the Supreme Court found it inappropriate to employ a harmless error analysis where a criminal defendant was completely deprived of the Sixth Amendment right to counsel at trial,[11] and also where a criminal defendant was

---

**11.** *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

tried before a biased judge.[12]

The Supreme Court has not addressed the issue of whether an *Ake* violation such as the one currently before this Court can be subject to harmless error analysis. However, some guidance as to this issue can be found in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Prior to *Fulminante*, the Supreme Court had found use of a coerced confession at trial to be one of the constitutional violations so basic to a fair trial that it could never be treated as harmless.[13] However, in *Fulminante*, a majority of the Court departed from this established precedent. In doing so, the majority reasoned that harmless error analysis may be applied to constitutional violations involving trial error which occurs during the presentation of the case to the jury because such error can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 308, 111 S.Ct. at 1264, 113 L.Ed.2d at 330. In contrast, errors which cannot be subject to harmless error analysis are those which exemplify "structural defects in the constitution of the trial mechanism." *Id.* 499 U.S. at 309, 111 S.Ct. at 1265, 113 L.Ed.2d at 331. The Court reasoned that errors such as absence of counsel for a criminal defendant and an impartial judge affect the entire conduct of a trial from the beginning to the end. "Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* 499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331.

Similar reasoning can be found in the earlier case of *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), where the Supreme Court declined to apply a harmless error analysis to a situation involving an attorney who represented multiple defendants with conflicting interests despite the codefendants' requests for separate counsel. The Court noted that, "[i]n the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." *Id.* 435 U.S. at 490, 98 S.Ct. at 1182, 55 L.Ed.2d at 438. The danger in joint representation of conflicting interests lay not in what counsel did but in what counsel felt compelled to refrain from doing. This applied not only to trial but also to pretrial plea negotiations and the sentencing process. The Court reasoned:

> It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

*Id.* 435 U.S. at 490–91, 98 S.Ct. at 1182, 55 L.Ed.2d at 438.

In contrast to the situation presented in *Holloway*, one can look to that at issue in *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), where a capital defendant's right to consult with counsel before submitting to a psychiatric examination was violated and psychiatric testimony obtained pursuant to this evaluation was introduced during the sentencing stage of trial.[14] In determining that a harmless error analysis could be applied to this Sixth Amendment violation, the Supreme Court noted that, "the effect of the Sixth Amendment violation is limited to the admission into evidence of [the examining psychologist's] testimony. We

---

**12.** *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

**13.** *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

**14.** This Sixth Amendment right was formally recognized in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial." *Id.* 486 U.S. at 257, 108 S.Ct. at 1798, 100 L.Ed.2d at 294. The Court concluded that under such circumstances, "a reviewing court can make an intelligent judgment about whether the erroneous admission of psychiatric testimony might have affected a capitol sentencing jury." *Id.* 486 U.S. at 258, 108 S.Ct. at 1798, 100 L.Ed.2d at 295.

Again, in the case at bar, it was amply demonstrated to the trial court that Appellant's sanity at the time of the offense was likely to be a significant factor at trial. Competent psychiatric assistance was sought under *Ake v. Oklahoma* to assist in preparing Appellant's defense in the guilt/innocence stage of trial and, if necessary, to offer mitigating evidence during sentencing stage. Appellant was, in effect, wrongfully deprived of meaningful inquiry as to the potentiality of his only possible valid defense. The effects of this constitutional deprivation were possibly as far reaching as the second stage proceedings where Appellant may have been denied access to crucial mitigating evidence.[15]

Clearly, the constitutional error which occurred in this case did not simply involve an individual portion of evidence, the effect of which may be quantitatively assessed by this Court. Rather, this error involving Appellant's only potential defense, affected the entire conduct of the trial from the beginning to the end. The nature of this error involved that evidence which was not discovered, as opposed to situations concerning evidence wrongfully introduced. This Court simply can not look to the record and make an intelligent judgment about whether the evidence which may have been discovered would have affected the outcome of the trial. To do

so would require unguided speculation about what the expert psychiatrist may or may not have found. Accordingly, the constitutional error before this Court in this case is not subject to harmless error analysis. Having so found, this case must be reversed and remanded to the district court for a new trial.

Because the error discussed in proposition I requires reversal, this Court need not discuss each of Appellant's remaining fifteen propositions of error. However, we will address Appellant's second proposition of error to clarify an apparent ambiguity. At the close of the State's case in chief in the second stage, defense counsel entered a demurrer which was overruled. He chose to stand on his demurrer and he did not put on any evidence in second stage. As a justification for this decision defense counsel stated:

> We believe that if, if this time if we put on any evidence in the second stage that we would waive both second stage and first stage demurs [sic]. I have reserched [sic] the law on this and even though this type of proceeding is a two stage proceeding there are absolutely, well, the cases are legion through the Court of Criminal Appeals regarding if the defense puts on any evidence they waive their demur or motion for directed verdict and the right to challenge on appeal, overruling of the demur [sic]. There is no guidance from the Court of Criminal Appeals concerning that particular legal issue in a two stage proceeding. We've researched that and right now I believe under existing case law if I put on any witnesses I have waived the objection to your overrule on our demur [sic] and I believe that I cannot do that in this particular case. So, I want to advise the Court that my in the record that not putting on evidence through witnesses in the second stage litigation is not a trial strategy. I

**15.** To compound the potential for injury, the State offered evidence concerning Appellant's mental state at the time of the commission of the crime through an unendorsed psychiatrist from Texas who had examined Appellant. Although Appellant was given a short continuance during which to prepare for the testimony of this witness, without the benefit of his own evaluation by a competent psychiatric expert, Appellant was left virtually unequipped to rebut the testimony

of this witness who opined that Appellant did not suffer from MPD, but rather, was malingering. In effect, the prosecution was allowed to use the testimony of this unendorsed expert to rebut a defense not raised by Appellant because the Appellant had not been provided a psychiatric expert. The State did this with full knowledge that the defense could not counter with expert testimony of its own.

believe I am bound and compelled under Oklahoma law to do that if I wish to preserve the error on the demur [sic] and that's the reason coupled with the reasons we've previously stated the unavailability of Doctor Brawn [sic] and so forth and so on. This is not a trial strategy maneuver but rather I fell compelled under the law that this what we must do to protect my client rights.[16]

It is Appellant's contention on appeal that defense counsel's rationale for his decision to stand on his demurrer and not put on any evidence in the second stage of trial reveals that he was operating under a mistaken assumption of the law which caused his conduct to fall outside the bounds of 'reasonable assistance' as is required by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, Appellant argues he was denied effective assistance of counsel.

Appellant's argument is based upon the premise that defense counsel incorrectly believed that to put on any evidence in second stage would waive both his first and second stage demurrers. This Court has long held that when a defendant goes forward with his case after a demurrer has been entered and overruled, he waives examination of the sufficiency of the evidence at the end of the State's case. *Snow v. State,* 876 P.2d 291, 295 (Okl.Cr.1994); *Jones v. State,* 772 P.2d 922, 925–26 (Okl.Cr.1989); *Doyle v. State,* 759 P.2d 223, 224 (Okl.Cr.1988). Under such circumstances, this Court will instead review the entire record as a whole in the light most favorable to the State to determine whether the evidence was sufficient to support the crime charged. *Snow,* 876 P.2d at 295–96. *See also Stout v. State,* 693 P.2d 617, 620 (Okl.Cr.1984), *cert. denied,* 472 U.S. 1022, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

█ From this body of law, defense counsel could have reasonably deducted that if he had gone forward with his case at the close of the State's case in first stage, he would have waived his right to challenge the trial

court's adverse ruling to the first stage demurrer. Defense counsel could have also reasonably believed that if he had gone forward with his case at the close of the State's case in second stage, he would have waived his right to challenge the trial court's adverse ruling to the second stage demurrer. However, whether defense counsel could have reasonably believed that if he had gone forward with his case at the close of the State's case in second stage, he would have waived his right to challenge the trial court's adverse ruling to the first stage demurrer is not as clear. This is because, as both parties point out, this Court has not ruled directly upon this issue. We now hold, however, that the waiver of a demurrer in the second stage does not waive a demurrer to the first stage because the second stage of a capital case is, by definition, a separate proceeding. *See,* 21 O.S.1991, § 701.10(A).

In light of the error discussed in Proposition I, the judgment and sentence of the trial court is **REVERSED** and **REMANDED** for a **NEW TRIAL.**

LANE, J., concurs.

JOHNSON, P.J., and CHAPEL, V.P.J., and LUMPKIN, J., concur in result.

LUMPKIN, Judge, concurring in result:

Let me see if I got this straight: Appellant was provided access to a psychologist, but his attorney did not want that one, because he claimed only a handful of mental health experts in the country were qualified to address the subject of Appellant's possible defense. The judge gave him additional time to find this Holy Grail of mental health; in fact, the judge ultimately gave him over six months to find it. Despite this half-year opportunity, it appears defense counsel took no action to secure this one-of-a-kind mental health expert[1] until just before trial, when he tried to get another continuance based on the expert's inability to testify at the time trial was set (In fact, it appears from the record defense counsel knew the witness

---

**16.** Trial Transcript VII, 7–8.

**1.** Although I note another Oklahoma trial attorney had no such difficulty finding an expert

acquainted with the disorder. *See Medlock v. State,* 887 P.2d 1333, 1340 (Okl.Cr.1994).

would not be available for the trial when he contracted with the expert for the case). The judge denied the request for continuance. Based on this, this Court would not only reverse and remand for a new trial, it would hold the judge's actions constitute error not subject to harmless error analysis.

I can only conclude the following from this series of events and this Court's holding: although a defendant is entitled to an attorney, he is not necessarily entitled to one of his choice. If the attorney (whether of his choice or not) is deficient, an appellant must not only show how the attorney was deficient, but he must also show how this deficiency prejudiced him. HOWEVER, if a defendant does not get the mental health expert of his choice, he need not show prejudice: he need only show his mental health expert was not the expert he wanted. I really do not think the Court wants to set a foundation for a principle of law on such sandy, moving soil. The record is devoid of evidence relating to what action defense counsel had taken to obtain a qualified expert witness. We are presented with statements in the record that a qualified expert was not available in Oklahoma when those very statements are refuted by *Medlock v. State,* a case of which we can take judicial notice. Experts were apparently available, but were not defense counsel's choice.

Because I agree Appellant's attorney was woefully incompetent by failing to act in a timely manner; and because this failure certainly prejudiced Appellant by not allowing him to present a *quality* defense, I concur reversal is warranted. If the trial judge erred in any manner it was in the failure to periodically hold a hearing and make a record which would chronicle defense counsel's efforts in obtaining a qualified expert; determine if court assistance was required in identifying qualified experts; and if counsel was being dilatory, then take action to secure an expert for the defense to ensure the case was tried at the time previously set.

However, I cannot believe that, while the performance of a defense attorney (undeniably the key element in *any* trial) is subject to review to determine prejudice, this same review is not available to determine the competency of a mental health expert, I must dissent to that portion of the opinion which seeks to interpret the right to an expert witness in that untenable manner. This opinion attempts to elevate a denial of a defendant's mental health expert of his choice into the same category of a biased judge and absence of an attorney altogether. That position is not supported by the law.

This Court typically saws the wood which is put in front of it. Here, that wood is the well-established principle of law governing attorney competency. To reverse on a basis which will not be repeated—certainly not here—is to turn what should be questionable dicta into questionable law by not only sawing the wood in front of us, but needlessly cutting down whole forests.

Let me repeat that in a different fashion: the issue here is *not* whether Appellant was denied a mental health expert to assist him in preparing his defense because the trial court judiciously guarded that right and granted an expert witness at state expense. In fact, Appellant was provided with an expert; but Dr. Philip Murphy did not think he was qualified to assist at trial after he diagnosed Appellant as suffering from MPD. In an overabundance of caution the trial judge afforded the Appellant the opportunity to obtain another expert who he thought was qualified and granted an extra six months to secure that expert. The issue is (1) whether his counsel was incompetent in failing to act in a timely manner in making arrangements for his qualified expert to be present at trial; and (2) whether, as a result of that counsel's failure Appellant was prejudiced by being forced, not to present his defense, but prevented from presenting a defense of the *quality* he would have liked. There is even another possibility: the trial court abused its discretion in refusing Appellant's request for a continuance which would have allowed him to present the defense with the expert he wanted (However, it is very hard to blame the trial judge when he granted an additional six months to obtain an expert and be prepared for trial). Because the Court can—and should—reverse on either of these well-established grounds, it need not address an

issue which is not germane to the resolution of the case.

In any event, the Court would hold this Sixth Amendment violation is not subject to harmless error analysis because Appellant was "in effect, wrongfully deprived of meaningful inquiry as to the potentiality of his only possible valid defense." This reasoning is flawed.

Initially, it is beyond debate an error does not automatically warrant reversal simply because it violates the Sixth Amendment. *See Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Crane v. Kentucky,* 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (restriction on a defendant's right to cross examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Rushen v. Spain,* 464 U.S. 114, 117–118, and n. 2, 104 S.Ct. 453, 454–455, and n. 2, 78 L.Ed.2d 267 (1983) (ex parte communication between judge and juror which implicated the denial of a defendant's right to be present at trial); *Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); *Brown v. United States,* 411 U.S. 223, 231–232, 93 S.Ct. 1565, 1570–1571, 36 L.Ed.2d 208 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); *Coleman v. Alabama,* 399 U.S. 1, 10–11, 90 S.Ct. 1999, 2004, 26 L.Ed.2d 387 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause). It is also beyond debate there is a "strong presumption" an error will fall into the category of errors which are subject to harmless error analysis. *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). It should also be beyond debate it would be an exceptional case in which a constitutional violation will not be subject to harmless-error

analysis. *See Arizona v. Fulminante,* 499 U.S. 279, 306–08, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991).

The error in this case is ineffective assistance of counsel, not a right to an expert of choice, and is not harmless. However, the Court would take the fact it is not harmless in this case and apply it to every conceivable situation which might come before it based on this attempt to create a new right to an expert of choice. In light of the facts of this case, I do not think that is appropriate. The real error is not an error which "transcends the criminal process." *Fulminante,* 499 U.S. at 311, 111 S.Ct. at 1265. In addition, the United States Supreme Court has already provided an analysis to utilize in determining if a defendant has been prejudiced or the error is harmless. That Appellant may have been prevented from presenting the *quality* of defense he wanted because his "good" expert could not attend does not detract from the fact he could have presented the *same* defense with the expert he claims was of lesser quality. The failure of counsel to act in a timely fashion to obtain the additional expert is clearly a trial error, subject to harmless error analysis.

Accordingly, I must dissent to that portion of the opinion.