1998 OK CR 68

**James Joseph FITZGERALD, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–96–1200.

Court of Criminal Appeals of Oklahoma.

Dec. 10, 1998.

1158

Sid Conway, Tulsa, for Defendant at trial.

Tim Harris, Mark Collier, Assistant District Attorneys, Tulsa, for the State at trial.

Paula J. Alfred, Assistant Public Defender, Tulsa, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, for Appellee on appeal.

## *OPINION*

CHAPEL, Presiding Judge:

¶ 1 James Joseph Fitzgerald was tried by jury and convicted of Count I, Robbery with a Firearm in violation of 21 O.S.1991, § 801; Count II, Attempted Robbery with a Firearm in violation of 21 O.S.1991, § 801; Count III, First Degree Murder (Malice Aforethought) in violation of 21 O.S.1991, § 701.7; and Count IV, Robbery with a Firearm in violation of 21 O.S.1991, § 801, in the District Court of Tulsa County, Case No. CF–94–3451. The jury found that Fitzgerald (1) was previously convicted of a felony involving the use or threat of violence; (2) committed the murder in order to avoid or prevent a lawful arrest or prosecution; and (3) probably would commit criminal acts of violence that would constitute a continuing threat to society. In accordance with the jury's recommendation, the Honorable E.R. Turnbull sentenced Fitzgerald to life imprisonment plus a $10,000 fine on Counts I, II, and IV, and death on Count III. Fitzgerald has perfected his appeal of this conviction and raises sixteen propositions of error. After thorough consideration of the record before us, we find pervasive error in the second stage of trial compels us to remand Count III for resentencing.

¶ 2 Fitzgerald spent the evening of July 15, 1994, with Regina Stockfleth and other friends. In the early morning hours of July 16, Fitzgerald, armed with an SKS assault rifle, robbed the Git–N–Go store at 7494 East Admiral Street in Tulsa. After the robbery he returned to Stockfleth's house, wearing a bandanna around his neck and carrying $55 cash in a Git–N–Go bag. He was asked to leave.

¶ 3 Fitzgerald arrived at the Git–N–Go store at 6938 East Pine about 2:45 a.m. The clerk, William Russell, took the SKS rifle away from Fitzgerald. Russell pointed the rifle at Fitzgerald but apparently could not release the safety on the weapon. Fitzgerald came over the counter, and the two scuffled. Russell escorted Fitzgerald (who had the rifle) out of the store and locked the doors. As Russell retreated behind the store counter, Fitzgerald turned and fired, shattering the glass doors. His bandanna mask had fallen, and his face was visible. Fitzgerald pointed the gun in Russell's direction and fired several shots, then ran. Police recovered eight spent casings and six bullets from various locations in the store, and one bullet was found in Russell's body. That bullet had passed through six cigarette packages, two counter partitions, and a roll of calculator tape before entering Russell near his left armpit. The bullet pierced his lung and spine and broke two ribs. Russell had massive internal bleeding and died of a gunshot wound to the chest.

¶ 4 After leaving the Pine Street store, Fitzgerald robbed the Git–N–Go store at 903 North Yale at approximately 3:00 a.m. He wore a bandanna mask and threatened the clerk with the SKS assault rifle. After this robbery Fitzgerald briefly returned to his parents' home, then left the state. In Illinois he traded the SKS rifle for $100 and a .357 magnum handgun. He was arrested in Missouri. Fitzgerald confessed to robbing the two stores and attempting to rob the store on Pine Street, but insisted he did not intend to injure or kill Russell.

¶ 5 Fitzgerald was represented by appointed counsel until a month before trial, when he exercised his right to proceed *pro se*. Trial counsel remained in the courtroom as standby counsel and assisted Fitzgerald in framing objections and making arguments to the court. Fitzgerald presented no evidence in mitigation in the second stage of the proceedings (punishment on the capital charge) or the third stage (punishment on the robbery charges).

## ISSUES RELATING TO GUILT OR INNOCENCE

¶6 In Proposition I Fitzgerald claims the trial court erred by accepting his purported waiver of the constitutional right to counsel where there was. no determination of competency and the purported waiver was not knowingly and intelligently made thus violating constitutional provisions. A criminal defendant has the absolute right to counsel, but he may waive that right if he clearly and unequivocally declares his wish to proceed *pro se* and the trial court determines: (1) the defendant is competent to make that decision and (2) the waiver is voluntary, knowing and intelligent.[1] The competency standard for the waiver of right to counsel is not higher than that for ability to stand trial, and a trial court need make a separate determination of competency only where the court has reason to doubt a defendant's competence.[2] A defendant is competent if he has the present ability to consult with his attorney and a rational and actual understanding of the proceedings against him.[3] The trial court must advise a competent defendant of the nature of the charges, the offenses against him, the range of punishment, and the dangers of self-representation.[4] This Court has consistently refused to impose a list of factors on trial courts, holding instead that a valid waiver is determined from the total circumstances of each case.[5]

¶7 Fitzgerald was represented by appointed counsel throughout the preliminary proceedings. On April 18, 1996, a hearing was held at which Fitzgerald's motion to proceed *pro se* was granted (trial began May 20). The trial court questioned Fitzgerald extensively to determine whether he was dissatisfied with his attorney's representation and whether he understood the consequences of his decision. Fitzgerald said he and his attorney did not agree on his defense but stated he was satisfied with her qualifications and experience. He said self-representation was his right as an American citizen and indicated he preferred to take control of his case since he would have to live with the outcome. The trial court found Fitzgerald was "in control of your faculties, that you understand what's going on, that you understand the conversations, the meaning and the consequences of conversations that we're having."[6] The trial court advised Fitzgerald of the nature of the charges, the offenses charged, and the range of punishment possible for each offense. Trial counsel confirmed she had explained Fitzgerald's Sixth Amendment rights. The trial court repeatedly advised Fitzgerald against self-representation, pointing out Fitzgerald did not know what he was doing, that this was a bad decision, and that Fitzgerald could get the death penalty because he decided to go *pro se*. In subsequent motions proceedings the trial court explained court procedures and gave Fitzgerald a comprehensive written outline of the trial structure, which included the court's *voir dire* questions on the death penalty and indicated when Fitzgerald would have the opportunity to argue, present evidence, and make motions to the court. The trial court arranged for Fitzgerald to have reasonable opportunity to move about the courtroom and present documents to the court or witnesses and defined the court's role in the proceedings. Throughout, the trial court stated if Fitzgerald changed his mind standby counsel would be re-appointed to represent him, even if trial had begun, and urged Fitzgerald to reconsider. Fitzgerald insisted he wanted to represent himself.

---

1. *Faretta v. California*, 422 U.S. 806, 835–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *Braun v. State*, 1995 OK CR 42, 909 P.2d 783, 787, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 559 (1996).

2. *Godinez v. Moran*, 509 U.S. 389, 401 n. 13, 113 S.Ct. 2680, 2688 n. 13, 125 L.Ed.2d 321 (1993).

3. *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806, 815, *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996).

4. *Braun*, 909 P.2d at 787.

5. *Id.* at 788; *Edwards v. State*, 1991 OK CR 71, 815 P.2d 670, 673.

6. April 18, 1996 Motions Hearing Transcript at 10.

¶ 8 The trial court determined that Fitzgerald was competent to waive counsel by finding that Fitzgerald was in control of his faculties and understood the proceedings. Fitzgerald claims the trial court should have conducted a separate hearing to determine competency because he had presented information raising a doubt about his competency to waive counsel. In support of his requests for state-funded expert assistance, Fitzgerald submits: (a) evidence that he suffered from juvenile-onset diabetes; (b) evidence he had received a gunshot wound to the head requiring surgery; (c) medical reports discussing some physical symptoms associated with juvenile-onset diabetes and the effects the disease may have on physical and psychosocial development, as well as evidence describing the effect of alcohol on a person with this disease; (d) assertions that he suffered some of these physical symptoms; and (e) evidence that he had been drinking the night of the murder. This information was not presented to support a suggestion that Fitzgerald was incompetent to stand trial or waive his right to counsel. Fitzgerald's competence was not questioned at any point in the proceedings, and the record does not support an inference that his decision to waive counsel resulted from poor impulse control, an exaggerated emotional reaction, a reaction to alcohol, or any other cognitive defect. Nothing in the record suggests Fitzgerald appeared incompetent or acted in an unusual manner during the hearing on his motion to proceed *pro se*, and no evidence introduced then or at any other proceeding cast doubt on Fitzgerald's ability to make an intelligent and knowing waiver. This Court cannot find that the information about Fitzgerald's diabetes and head injury alone raised a doubt about his competency sufficient to require a separate competency proceeding.

¶ 9 Fitzgerald also gave a knowing, intelligent, and voluntary waiver. He denied his decision was coerced during the April 18, 1996, hearing and does not suggest coercion on appeal. Fitzgerald had several prior convictions and was familiar with the criminal justice system. He was informed of the nature of the charges, offenses, and range of punishment and repeatedly advised that this was a bad decision. Over the course of several hearings, the trial court explained courtroom procedure and the role of each party, including Fitzgerald and standby counsel. Offered several opportunities to reconsider his decision, Fitzgerald clearly and unequivocally stated his intention to proceed *pro se*.[7] The record shows Fitzgerald's waiver of his right to counsel was knowing and voluntary.[8] This proposition is denied.

¶ 10 In Proposition III Fitzgerald claims the trial court showed obvious bias in this case depriving him of the right to an impartial judge in violation of constitutional provisions. The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court.[9] A defendant must show the trial court's prejudice against him materially affected his rights at trial, and the defendant must be prejudiced by the trial court's actions.[10] "The decision to recuse is within the discretion of the trial court, and this Court will disturb that ruling only for an abuse of discretion."[11] Abuse of discretion has occurred where trial judges become intertwined in cases due to personal relationships or take actions showing actual prejudice against a defendant.[12]

7. *Faretta*, 422 U.S. at 836, 95 S.Ct. at 2541.

8. *Braun*, 909 P.2d at 787.

9. Okla. Const. art II, § 6; *Bryan v. State*, 1997 OK CR 15, 935 P.2d 338, 354–55, *cert. denied*, —— U.S. ——, 118 S.Ct. 383, 139 L.Ed.2d 299.

10. *Bryan*, 935 P.2d at 354; *Stouffer v. State*, 1987 OK CR 92, 738 P.2d 1349, 1353, *cert. denied*, 484 U.S. 1036, 108 S.Ct 763, 98 L.Ed.2d 779; *Carter v. State*, 1977 OK CR 57, 560 P.2d 994, 996–97.

11. *Bryan*, 935 P.2d at 354–55.

12. *Wilkett v. State*, 1984 OK CR 16, 674 P.2d 573 (trial court expressed resentment of defendant, accused trial counsel of dishonest, false and dilatory action, and revealed annoying pre-trial contacts with defendant's family members); *Merritt v. Hunter*, 1978 OK 18, 575 P.2d 623 (trial court traveled without subpoena at own expense to testify against defendant's opponent in pending Kansas case); *Sadberry v. Wilson*, 1968 OK 61, 441 P.2d 381 (trial court must award brother attorney fees); *State ex rel. Larecy v. Sullivan*, 207 Okl. 128, 248 P.2d 239 (1952) (wife's opponent in divorce case worked for trial court politi-

¶ 11 Fitzgerald claims the trial court's repeated denial of his *Ake* claims shows actual bias which deprived him of a fair and reliable trial. He cites an exchange during a hearing held August 31, 1995, in which trial counsel asked Judge Turnbull to recuse. Counsel recalled that, at a previous hearing, Judge Turnbull said he did not believe in this sort of defense,[13] possibly because he hadn't quite gotten the prosecutor out of himself. Judge Turnbull replied that he thought counsel had misunderstood, that he may have said he was fresh out of the prosecutor's office and for that reason trying to be fair and impartial, and that he believed in every defense the law says is appropriate. The record suggests this exchange was in fact based on a misunderstanding. Nothing in subsequent proceedings indicates Judge Turnbull *did not believe* in Fitzgerald's defense, but he frequently said he *disagreed* with counsel regarding Fitzgerald's burden to make a showing before he was entitled to experts in order to present that defense to the jury; he also disagreed with Fitzgerald's claim that experts were necessary to present this evidence. This exchange simply does not show bias or prejudice against Fitzgerald.

¶ 12 Fitzgerald also complains of a comment Judge Turnbull made, out of the hearing of the jury, during a discussion of evidence to be offered in the second stage of trial. The State had filed notice that it would introduce an Indiana armed robbery conviction to support the aggravating circumstance that Fitzgerald had committed prior violent felonies. When Fitzgerald offered to enter a *Brewer*[14] stipulation to this offense, the State objected claiming details of the crime would be admissible to prove continuing threat. Judge Turnbull found in favor of Fitzgerald since the State had not given notice that this prior offense would be used to support the continuing threat aggravating circumstance. During the discussion Judge Turnbull remarked that he believed the jury should have this information since it was the same crime Fitzgerald had committed in this case. This comment does not reflect bias or prejudice requiring recusal. We have never held a trial court must have no personal opinions regarding guilt or innocence, or prejudice against a particular crime. The question is whether the trial court's personal opinion, if any, is communicated to the jury, skewing the fact-finding and deliberation process.[15] As this exchange was out of the jury's hearing, any possible negative inference could not have prejudiced Fitzgerald.

¶ 13 Finally, Fitzgerald claims bias in the trial court's refusal to instruct in mitigation that Fitzgerald was under the influence of alcohol at the time of the crimes. Judge Turnbull sustained the State's objection to this instruction without comment but observed in his Capital Felony Report that evidence was presented Fitzgerald was under the influence of alcohol at the time of the crimes. While we find this decision puzzling (see Proposition IX), nothing in the record supports an inference that the decision was made because of bias against Fitzgerald.

¶ 14 The trial court must perform its duty to see both sides have a fair trial.[16] None of the comments discussed above showed bias against Fitzgerald or infringed on his right to a fair trial. This proposition is denied.

## SECOND STAGE PROPOSITIONS CUMULATIVELY REQUIRING REVERSAL

¶ 15 Fitzgerald claims in Proposition II that the trial court erred by denying Fitzgerald expert funds after a proper *Ake* showing,

cal campaigns; opponent attorney was advisor to trial court).

13. Judge Turnbull was referring to Fitzgerald's request for experts to explain the effects of juvenile-onset diabetes, alcohol, and possible neurological impairment from the head wound.

14. *Brewer v. State*, 1982 OK CR 128, 650 P.2d 54, 63, *cert. denied*, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983) (defendant must be allowed to stipulate that prior felony convictions involved the use or threat of violence to the person).

15. *Arnold v. State*, 1990 OK CR 78, 803 P.2d 1145, 1148–49; *T.R.M. v. State*, 1979 OK CR 59, 596 P.2d 902, 905.

16. *Bryan*, 935 P.2d at 355.

thus depriving him of the right to present a first-stage defense and the right to present a defense to the death penalty by way of mitigation. He claims in two subpropositions that the trial court's denial of funds to hire an expert on juvenile-onset diabetes and a neuropsychiatrist deprived him of the ability to defend against the capital charges. We determine the trial court abused its discretion in denying Fitzgerald funds for experts. While denial of the funds was error in both stages, the first stage error was harmless. The error was not harmless in second stage.

¶ 16 Fitzgerald tirelessly and constantly requested that the State provide funds under *Ake v. Oklahoma*[17] for a neuropsychologist and an expert on juvenile-onset diabetes. Fitzgerald had to apply to the trial court because he was defended by the Tulsa County Public Defender's Office rather than the Oklahoma Indigent Defense System, which handles such funding requests internally.[18] *Ake* held that when an indigent defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, he is entitled to experts, at the State's expense, who will assist in evaluation, preparation and presentation of the defense.[19] This Court has extended the principles of *Ake* to any expert necessary for an adequate defense.[20] In doing so, we have emphasized the necessity of providing each defendant with the "basic tools" for his defense.[21] This comports with the Legislature's intent that indigent defendants be provided experts, and non-expert assistance, at State expense. In creating the Indigent Defense System, the Legislature has consistently provided that the Executive Director of that System shall approve expert witnesses, and non-expert assistance, when those services are necessary in a particular case.[22] The Legislature has also provided that in counties where the population is over 200,000 expert witness compensation for indigent defendants shall be paid by the court fund.[23] We are concerned here, not with the technicalities of who pays and what procedures for payment are followed, but with the clear intention that all defendants are entitled to necessary expert assistance when that constitutes a basic defense tool. By extending *Ake*, we have ensured that the Legislature's intent is preserved, and indigent defendants in all counties of Oklahoma have access to the basic tools necessary for an adequate defense.

¶ 17 Applying the three-part test set forth in *Ake*, we balance: (1) Fitzgerald's private interest in the accuracy of the proceedings; (2) the State's interest affected by providing the assistance; and (3) the probable value of the procedural safeguards sought and the risk of inaccuracy in the proceedings without the requested assistance.[24] We conclude that Fitzgerald's interest and the interest of accuracy in the proceedings outweigh the State's interest in not expending funds. The trial court apparently also came to this

17. 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

18. 22 O.S.Supp.1997, § 1355.4(D).

19. *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096.

20. *Rogers v. State*, 1995 OK CR 8, 890 P.2d 959, 966, *cert. denied*, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (and cases cited therein).

21. *Washington v. State*, 1990 OK CR 75, 800 P.2d 252, 253; *see also Ake v. State*, 1989 OK CR 30, 778 P.2d 460, 464 n. 1 (this Court follows other states in concluding *Ake* applies to any expert necessary for adequate defense).

22. 22 O.S.Supp.1997, § 1355.4(D) (expert witnesses approved from a list of authorized expert contractors; non-experts authorized by the Executive Director upon request and approval). In *Toles v. State*, 1997 OK CR 45, 947 P.2d 180, 187–88, we held there was no *Ake* violation where the Executive Director failed to approve an attorney's request for a pharmacologist to investigate and develop a voluntary intoxication defense. *Toles* is distinguishable because there, we determined that the Executive Director of OIDS was a member of the defense team, and the decision to deny funding was thus trial strategy. Here, of course, the trial court is not a member of the defense team, and its decision to deny funds cannot be considered a strategic move by the defense. We review the trial court's action for abuse of discretion.

23. 19 O.S.Supp.1997, § 138.8. Payment is pursuant to procedures established by the governing board of the court fund.

24. *Ake*, 470 U.S. at 78–80, 105 S.Ct. at 1093–1094; *Rogers*, 890 P.2d at 966.

conclusion, as its repeated denials of Fitzgerald's request turn instead on whether Fitzgerald had made the required preliminary showing.

¶ 18 Fitzgerald claimed that the combination of his juvenile-onset diabetes, probable brain damage from his head injury, and drinking habits (including drinking before committing the crimes) affected his mental processes and deprived him of the ability to form the intent to kill necessary for malice murder. To qualify for expert assistance, a defendant must make "an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense...."[25] We have held the threshold showing is met where a defendant shows need and that he will be prejudiced by the lack of expert assistance.[26] Fitzgerald presented evidence to support his claims at four *ex parte* pretrial motions hearings; *ex parte* hearings were also held after the first stage and before second stage instructions were given. Each time, the trial court determined Fitzgerald had failed to make the preliminary showing necessary under *Ake.*

¶ 19 Over the course of these hearings, Fitzgerald presented: (1) evidence admitted in the preliminary hearing that he had been drinking and was under the influence of alcohol at the time of the crime; (2) medical evidence that he suffered from juvenile-onset diabetes and had received a gunshot wound to the head requiring surgery in 1985; (3) medical articles on the physical, psychological, and psychosocial effects of juvenile-onset diabetes; (4) information that the combination of alcohol and juvenile-onset diabetes could result in poor judgment, poor impulse control, and exaggerated emotional responses; (5) an affidavit detailing Fitzgerald's physical and psychological symptoms corresponding with symptoms discussed in the medical literature; (6) an affidavit including a neuropsychologist's general explanation of

the symptoms which, occurring after a head wound, may signal brain injury, and a description of the neuropsychological tests necessary to determine the existence and extent of such an injury; (7) an affidavit from the then Deputy Chief of the Capital Trial Division, Oklahoma Indigent Defense System (OIDS), who believed that Fitzgerald would qualify for expert funds were he being defended by OIDS; (8) information about Fitzgerald's childhood and family life resulting from his diabetes; and (9) Dr. Taylor's current psychological evaluation noting Fitzgerald's head injury and diabetes, diagnosing him as depressed, alcoholic, with poorly regulated diabetes and probable neurological impairment, and strongly recommending neurological testing plus consultation with a juvenile-onset diabetes expert. This is far more than, as the State argues, an "underdeveloped claim"; Dr. Taylor's report, combined with the other evidence, certainly contained enough information to meet the threshold requirement for a preliminary showing.[27]

¶ 20 Fitzgerald argued to the trial court and claims on appeal that this information is sufficient to meet the *Ake* threshold. We agree. In applying for funds to hire experts, Fitzgerald is merely required to show his physical and psychological condition at the time of the crime will be *a significant factor* in his defense. *Ake* stated a defendant has a right to expert assistance "to help determine whether the insanity defense is viable," as well as to conduct an appropriate examination and assist a defendant in evaluating, preparing, and presenting his defense.[28] The trial court consistently held that, to make a proper showing, Fitzgerald would have to demonstrate that he actually suffered from these conditions and problems at the time of the offense. To require such specificity in a preliminary showing renders the *Ake* categories of assistance pointless.[29] If a de-

---

25. *Ake,* 470 U.S. at 82, 105 S.Ct. at 1096.

26. *Rogers,* 890 P.2d at 967; *Tibbs v. State,* 1991 OK CR 115, 819 P.2d 1372, 1377.

27. *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985).

28. *Ake,* 470 U.S. at 82–83, 105 S.Ct. at 1096.

29. Cf. *Starr v. Lockhart,* 23 F.3d 1280, 1290–91 (8th Cir.), *cert. denied sub nom. Norris v. Starr,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994) (ability to subpoena and question State examiners does not fulfill *Ake* requirements regarding assistance, evaluation and presentation).

fendant must be able to show initially that he actually suffered from a condition at the time of the offense, there is no need for expert assistance in determining whether the defense based on that condition is viable, nor will an expert be needed to evaluate the defendant and the defense.

¶ 21 Fitzgerald made a showing of need when he presented detailed evidence, including a psychologist's report,[30] that he (1) suffered from a chronic, long-term physical condition with psychological components that, combined with alcohol, may have affected his judgment and behavior the night of the crimes, and assistance of a juvenile-onset diabetes expert was necessary to confirm and explain that connection and (2) had suffered a wound with probable organic brain damage which could have affected his judgment and behavior the night of the crimes, and which could only be determined through specific neuropsychological testing available in the community. We discuss his showing of prejudice with regard to each stage of the trial below.

¶ 22 We first address Fitzgerald's claim that he was deprived of the right to present a first-stage defense. Since his arrest, Fitzgerald has stated he did not intend to kill Russell. Fitzgerald claimed he needed the experts during the first stage of trial to effectively present his defense that voluntary intoxication, under his special circumstances, rendered him incapable of forming the intent necessary for malice murder. Voluntary intoxication is not a complete defense to malice murder but may be considered in determining whether a defendant had the intent to kill during the commission of the crime.[31] Sufficient evidence must be introduced to show a defendant was so intoxicated his mental powers were overcome and he was unable to form criminal intent.[32] Fitzgerald showed he was prejudiced by the trial court's ruling since the experts would have tied the evidence that he was intoxicated at the time of the crimes to evidence that he suffered from diabetes (and, possibly, organic brain damage). The experts would have explained to the jury how the combination of those two factors created a physical/mental condition in which Fitzgerald was unable to form the intent necessary for malice murder. This testimony would have strengthened Fitzgerald's claim that he did not intend to kill Russell and enabled him to rebut the State's very effective argument for malice murder, which was based in large part on the State's version of Fitzgerald's state of mind at the time. Fitzgerald showed both need and prejudice, and the trial court's denial of his request for expert funds was error.

¶ 23 Having found error in the first stage proceedings, we must determine whether harmless error analysis applies. Fitzgerald relies on *Frederick v. State*[33] for his claim that harmless error analysis cannot apply. In *Frederick* the defendant's only defense was insanity; the erroneous denial of an *Ake* expert completely denied him any ability to defend against the charges. This Court determined the error permeated the entire trial, since we could not look at any evidence presented on Frederick's behalf but would be forced to speculate on what it might have been. Under those narrow circumstances, we held the denial of an *Ake* expert was not subject to harmless error analysis.

---

30. The fact Fitzgerald was examined and diagnosed by Dr. Taylor does not change our decision that he was entitled to his requested experts under *Ake*. Dr. Taylor, a psychologist, diagnosed Fitzgerald as best she could but was not qualified to adequately diagnose or explain Fitzgerald's conditions which went to his ability to form intent. Dr. Taylor explicitly recommended further testing by appropriate experts in those areas. This is not a case where a defendant is provided with an expert but wishes to have access to more or better experts. Rather, Fitzgerald was examined by Dr. Taylor in an effort to show that he needed appropriate expert assistance to prepare his defense—he was, in fact, trying to use an expert to get an expert. *Ake* emphasized that a defendant is entitled to appropriate expert assistance. *Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1096. Dr. Taylor was not the appropriate expert in this case.

31. *Edwards v. State*, 1982 OK CR 204, 655 P.2d 1048, 1051; *Jones v. State*, 1982 OK CR 112, 648 P.2d 1251, 1255, *cert. denied*, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983).

32. *Jackson v. State*, 1998 OK CR 39, 964 P.2d 875, 892.

33. 1995 OK CR 44, 902 P.2d 1092.

However, we agree with the Tenth and Eighth Circuits that, generally, "a right to which a defendant is not entitled absent some threshold showing [cannot] fairly be defined as basic to the structure of a constitutional trial."[34] We hold that, absent the narrow circumstances presented by *Frederick*, harmless error analysis applies to *Ake* error.

▮▮▮ ¶ 24 Having concluded harmless error analysis applies, we must determine whether this error is harmless beyond a reasonable doubt.[35] Although expert testimony would have helped Fitzgerald explain his state of mind and ability to form intent, it was not necessary to raise the issue of voluntary intoxication. A defendant may claim voluntary intoxication as a defense to malice murder where evidence of overwhelming intoxication is presented. No experts are needed to raise the defense. Although the evidence of intoxication was conflicting, Fitzgerald could have made his voluntary intoxication claim based on that evidence without relying on expert testimony. Thus, Fitzgerald was not denied his ability to defend against the malice murder charge. The trial court's erroneous denial of *Ake* experts in the first stage of trial was harmless beyond a reasonable doubt.

▮▮▮ ¶ 25 Fitzgerald also claims in this section that the trial court's denial of funds under *Ake* resulted in an equal protection violation. He claims that had his crimes been committed in any county except Oklahoma or Tulsa counties he would have been represented by OIDS and entitled to funding without asking the trial court. The only support in the record for his claim that he would have received funding for experts from OIDS is an affidavit by the then Chief of the OIDS Capital Trial Division, who claimed he believed that, in a case with similar facts, OIDS would authorize payment for the requested experts. However, the affiant was not himself in a position to authorize such expenses, and his opinion is at best an educated guess. Absent some indication that Fitzgerald was in fact treated differently from other capital defendants similarly situated, we will not reach the merits of this claim.

¶ 26 We next address Fitzgerald's claim he was deprived of the right to present mitigating evidence. Fitzgerald argues that, without experts, he was denied the opportunity to present mitigating evidence. He argues the mere facts of the gunshot wound and his diabetic condition are not particularly mitigating, and he needed experts to present the effects these conditions had on his physical, mental and social development, as well as the effect of his diabetes on his family and childhood. Indeed, the State effectively argued at trial that neither of these conditions was mitigating and suggested the gunshot wound might work in aggravation.

▮▮▮ ¶ 27 It is settled that a defendant may present in mitigation any aspect of his record or character, and any circumstances of the crime.[36] The trial court recognized this when it stated the evidence about Fitzgerald's diabetes and brain injury would be appropriate in mitigation. However, since the court erroneously believed Fitzgerald had not made an *Ake* showing, it suggested, "You can have his relatives, friends or doctor testify that he had these conditions, or has had these conditions."[37] We reject the suggestion that lay witnesses provide an effective substitute for expert testimony in these circumstances.[38] Fitzgerald's friends and family could have testified regarding symp-

---

**34.** *Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir.1995), *cert. denied*, 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996), *quoted in Starr*, 23 F.3d at 1291; see also *Castro v. Oklahoma*, 71 F.3d 1502, 1515 (10th Cir.1995) (*Ake* violations subject to harmless error analysis).

**35.** *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

**36.** *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875–77, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978).

**37.** November 2, 1995 Motions Hearing Transcript at 9–10.

**38.** *Ake*, 470 U.S. at 80, 105 S.Ct. at 1095 (lay witnesses can merely describe symptoms they believe relevant to a defendant's mental state, while experts can identify the symptoms of insanity); *Castro*, 71 F.3d at 1514 (defendant entitled to expert although lay witnesses testified).

toms and behavior they observed, and his pediatrician and surgeon could have testified regarding their diagnoses and treatments. However, these witnesses could not effectively explain the particular problems and phenomena associated with juvenile-onset diabetes, nor could they describe the physiological and psychological effects resulting when alcohol and diabetes are combined. These witnesses certainly could neither conduct neuropsychological tests nor present the result of those tests to the jury. As other witnesses could not present this mitigating evidence, Fitzgerald has shown he was prejudiced by the trial court's decision.

¶ 28 Fitzgerald was also entitled to expert assistance to rebut the State's charge that he would be a continuing threat to society. *Ake* held that a capital defendant was entitled to expert assistance where the State presents psychiatric evidence of his future dangerousness.[39] The Tenth Circuit has extended this principle, concluding a defendant is entitled to an expert "if the State presents evidence, psychiatric or otherwise, of the defendant's future dangerousness or continuing threat to society during the sentencing phase, and the indigent defendant establishes the likelihood his mental condition is a significant mitigating factor."[40] Like the Tenth Circuit, we have rejected a narrow construction of *Ake*.[41] *Ake* focused, not on whether the State presented expert evidence, but on "the probable value that the assistance of a psychiatrist will have in this area and the risk attendant on its absence."[42] In the

absence of any explicit limitation by the Supreme Court and given our extension of *Ake* to any expert assistance necessary for an adequate defense, logic and fairness dictate that a qualified defendant should receive expert assistance to rebut any State evidence of continuing threat. Principles of comity also support our conclusion that, absent any compelling reason to the contrary, we will follow the Tenth Circuit's persuasive opinions on this federal constitutional issue.[43]

¶ 29 Fitzgerald was prejudiced by his inability to respond to the continuing threat charges with expert testimony. He presented no evidence in mitigation. The jury could only consider the possible mitigating circumstances listed in the instructions, without any indication of why those factors were actually mitigating. The State argued that neither his diabetes nor the 1985 head wound were in any way mitigating and suggested that the fact Fitzgerald engaged in armed robbery after being shot in the head made that factor aggravating, if anything. Only the requested expert testimony could have fully explained the mitigating nature of these conditions. The trial court implicitly recognized this. After both sides had rested in second stage, the judge again denied Fitzgerald's *Ake* motion and remarked:

> I think that Fitzgerald could have introduced any and all mitigating evidence that he wished to, and that *much of the information, if not all* of the information that he wished to inform this jury of would,

39. *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096.

40. *Castro*, 71 F.3d at 1513; *Brewer*, 51 F.3d at 1529; *Liles v. Saffle*, 945 F.2d 333, 340–41 (10th Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992).

41. *Rogers*, 890 P.2d at 966.

42. *Ake*, 470 U.S. at 84, 105 S.Ct. at 1096; *Liles*, 945 F.2d at 341.

43. *McLin v. Trimble*, 1990 OK 74, 795 P.2d 1035, 1047 n. 17 (Justice Opala, dissenting); *Dean v. Crisp*, 1975 OK CR 95, 536 P.2d 961, 964, *overruled on other grounds by Edwards v. State*, 1979 OK CR 18, 591 P.2d 313, 316. The State cites these cases for their suggestion that we need not adopt the Tenth Circuit's reasoning. However, the State simply suggests we rely on *Brewer v. State*, 1986 OK CR 55, 718 P.2d 354, which was

overturned on this very issue in *Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir.1995), *cert. denied*, 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996). *Brewer* was decided immediately after *Ake*, when this Court had adopted the narrowest possible construction of that decision. Our *Ake* jurisprudence has significantly changed since then. The State offers no compelling reason to ignore common sense, fairness, or the Tenth Circuit. In fact, the State urged us to adopt the Tenth Circuit's view, *set forth in these same cases*, that an *Ake* violation is subject to harmless error analysis. We decline the State's invitation to adopt only a portion of the Tenth Circuit's reasoning on *Ake* while rejecting other reasoning found within the same cases. The only possible reason to adopt *Brewer* here would be in order to refuse to reach the merits of this issue.

would have been understood by the jury, and they would have found out whether they thought that was appropriate or not. He chose in all instances not to present any mitigating evidence whatsoever.[44]

If the jury could have understood *much, if not all*, of Fitzgerald's evidence without experts, then experts were necessary to present *all* the mitigating evidence.

¶ 30 We must determine whether this error is harmless. Although Fitzgerald should have had experts to rebut the continuing threat charge, this evidence would have been probative of much more than that aggravating circumstance. Thus, this Court cannot simply invalidate that circumstance and reweigh the remaining evidence. As Fitzgerald presented no evidence at all in mitigation, we cannot speculate about what these experts might have said nor weigh the evidence actually presented against the evidence offered in aggravation.[45] Although lay witnesses were available, we have determined that they could not effectively present this mitigating evidence, so Fitzgerald's failure to call them does not lessen the severity of this error.[46] As we cannot say this evidence in mitigation would not have swayed at least one juror, we cannot find this error harmless beyond a reasonable doubt. In other contexts, this Court has vigilantly preserved the rights of capital defendants to introduce psychological evidence in mitigation.[47] In combination with other errors in

the second stage, this error requires reversal and remand for capital sentencing.

¶ 31 In Proposition IV Fitzgerald argues the trial court erred by death qualifying the jury without fulfilling its legal duty to life qualify the jury, resulting in a guilt/death prone jury in violation of constitutional provisions. Voir dire is designed to discover actual and implied bias and determine whether jurors' views would substantially impair the performance of juror duties in accordance with the trial court's instructions and the juror oath.[48] Jurors who would automatically vote either for or against the death penalty will necessarily fail to consider all the evidence presented in aggravation and mitigation and should be removed for cause.[49] Upon a defendant's request, a trial court must determine whether each juror can consider the punishments of life and life without parole as well as the death penalty ("life-qualify" the jury).[50] It is not error for a trial court to deny a defendant's request that the court life-qualify the jury where trial counsel has the opportunity to ask those questions,[51] but a defendant, his attorney, or the trial court must be allowed to ask life-qualifying questions after the defendant's request.[52]

¶ 32 On March 23, 1995, Fitzgerald filed a Motion to Life Qualify Of [sic] the Jury. Fitzgerald requested that, after jurors were death-qualified, the trial court ask seven enumerated questions (or substantially similar questions).[53] The trial court denied

---

44. Trial Transcript at 1154 (emphasis added).

45. *Frederick v. State*, 1995 OK CR 44, 902 P.2d 1092, 1098.

46. *Castro*, 71 F.3d at 1514.

47. *Allen v. State*, 1997 OK CR 44, 944 P.2d 934; *Wisdom v. State*, 1996 OK CR 22, 918 P.2d 384.

48. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Mitchell v. State*, 1994 OK CR 70, 884 P.2d 1186, 1195, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

49. *Morgan v. Illinois*, 504 U.S. 719, 728–729, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992); *Witherspoon v. Illinois*, 391 U.S. 510, 521–22, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968).

50. *Morgan*, 504 U.S. at 729, 112 S.Ct. at 2229; *Hammon v. State*, 1995 OK CR 33, 898 P.2d 1287, 1300.

51. *Cannon v. State*, 1998 OK CR 28, ¶ 7, 961 P.2d 838, 844, 69 OBJ 1804, 1804–05.

52. *Hammon*, 898 P.2d at 1300.

53. Summarized, the questions were: (1) Whether the juror believed the death penalty was ordinarily the only appropriate punishment for first degree murder; (2) If there was any case in which the juror would not favor the death penalty as punishment for premeditated malice murder; (3) Whether the juror could consider a sentence less than death after convicting Fitzgerald of first degree murder; (4) Whether, after convicting Fitzgerald of malice murder, the juror would presume that life or life without parole was proper until that presumption was overcome by proof beyond a reasonable doubt that the death penalty was the only appropriate penalty; (5) After hearing all the evidence and finding Fitzgerald guilty of first degree murder, would the juror have any preconceived notions about penalty; (6) Would

this motion without comment at the April 18, 1995, motions hearing.[54] Having refused to life-qualify the jury itself, the trial court was required to allow counsel to do so. Of course, Fitzgerald represented himself at trial. Three times Fitzgerald inartfully attempted to ask life-qualifying questions by asking jurors under what circumstances they would impose a death sentence, and each time the State's objection was sustained. The record is unclear whether these objections were sustained purely due to the form of the question or due to the life-qualifying substance. The unfortunate result is that, despite Fitzgerald's request, the jury was not life-qualified. Under the circumstances of this case we cannot say this result does not amount to an abuse of discretion.

¶ 33 We must determine the proper remedy for this error. In *Hammon* we reversed for resentencing where the trial court refused to allow the defendant to life-qualify the jury. In *Cannon* we held it was not error for the trial court to refuse to ask life-qualifying questions where trial counsel successfully did so. This situation falls between the two. We need not determine whether this error is reversible per se but find it contributes to an accumulation of error which necessitates reversal of the second stage of the proceedings and a remand for resentencing on the capital murder charge.

¶ 34 In Proposition VI Fitzgerald claims the trial court erred by excluding evidence to rebut continuing threat, by failing to protect Fitzgerald's right to reliable sentencing, and by denying requested instructions on the

meaning of life without parole. Only the second of these claims has merit.

■ ¶ 35 Fitzgerald first complains in Subproposition A that the trial court excluded evidence from Mr. Steve Strode, from the Department of Corrections, who would have testified about the conditions under which Fitzgerald would serve a sentence of life imprisonment without the possibility of parole. Fitzgerald claims this information should have been presented to the jury under *Simmons v. South Carolina.*[55] This Court has held *Simmons* does not apply to Oklahoma's capital sentencing structure since Oklahoma capital juries are aware that a defendant may be sentenced to life, life without the possibility of parole, or death.[56] We have specifically held it was not error to refuse a defendant's request to call Mr. Strode to testify about Department of Corrections policy and practice.[57] This subproposition is denied.

■ ¶ 36 Fitzgerald correctly argues in Subproposition B that evidence of the nature of his conviction for escape was admissible to rebut evidence introduced in aggravation. A defendant has a right to a fair opportunity to defend against the State's accusations, and the rules of evidence should not be mechanistically applied to defeat that right in a capital case.[58] The State introduced evidence of a 1978 escape conviction in Nebraska to support the continuing threat and prior violent felony aggravating circumstances. Fitzgerald objected because in a pretrial ruling the court had held the escape charge would not be admissible in the capital sentencing stage;

the juror consider all three punishments in determining the appropriate punishment; and (7) Does the juror understand he is never required to impose the death penalty, and may always choose to sentence Fitzgerald to life without parole. O.R. at 118—119.

**54.** The State argued the questions were improper because jurors should only be asked whether they could consider the three alternative punishments. This was an inaccurate statement of law. The record does not reflect whether the trial court adopted this reasoning in reaching its decision.

**55.** 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (error where a capital jury is not told

a defendant is parole ineligible and thus wrongly believes the only sentencing options are life with parole or death).

**56.** *Hain v. State,* 1996 OK CR 26, 919 P.2d 1130, 1145, *cert. denied,* —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517; *Hamilton v. State,* 1997 OK CR 14, 937 P.2d 1001, 1011–12, *cert. denied,* —— U.S. ——, 118 S.Ct. 716, 139 L.Ed.2d 657; *Trice v. State,* 1996 OK CR 10, 912 P.2d 349, 351–52.

**57.** *Hamilton,* 937 P.2d at 1011–12.

**58.** *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979).

this ruling was later modified, but the escape charge was not specifically mentioned. Through a misunderstanding the State believed the escape conviction would be admissible, but Fitzgerald's stand-by counsel thought she had told the State the escape was non-violent and believed it would not be admitted. Fitzgerald argued that the conviction could not support the aggravating circumstances because it was non-violent, but he was overruled. Fitzgerald rested without presenting evidence.

¶ 37 After discussing the proposed instructions, standby counsel presented Defendant's Exhibit 6, a non-certified copy of the Nebraska Information, which showed that the escape conviction was a non-violent walkaway from a work release program. The State did not contest the non-violent nature of the escape. The prosecutor admitted that the Information was the same document attached to the certified copy of the Judgment and Sentence introduced by the State to support the aggravating circumstances but claimed that the State would not be allowed to admit a non-certified document and what was "sauce for the goose was sauce for the gander." This is, of course, an inaccurate perception of the law regarding a capital defendant's right to present evidence rebutting aggravating circumstances. The trial court appeared more concerned that Fitzgerald had not attempted to introduce the Information before he rested. Standby counsel replied that was her mistake, but the trial court noted this matter was not included in the list of things counsel had said they needed to do before bringing the jury back in and ruled the document was untimely and inadmissible.

¶ 38 Although both parties had rested, the jury had not been instructed nor argument heard, and the document could easily have been admitted into evidence for use in argument. The record reflects a genuine misunderstanding which resulted in Fitzgerald's surprise at having to defend against this charge in this stage of the case. To reflexively apply the rules of evidence on document authentication when no party questioned the actual authenticity of the document and to refuse to admit the evidence because it was not introduced a few moments earlier before the jury completely deprived Fitzgerald of the ability to respond to the State's accusations. This is exactly the sort of action the Supreme Court condemns.[59] Several other convictions were admitted to support the prior violent felony aggravating circumstance, and this error would not, standing alone, require reversal. However, combined with other error in the second stage, it does necessitate reversal and remand for resentencing on the capital murder charge.

¶ 39 Finally, Fitzgerald argues in Subproposition C that the trial court erred in denying his requested instructions on the meaning of life without parole. Fitzgerald acknowledges we have previously held it is not error to refuse a defendant's request to instruct on life without parole.[60] We will not reconsider this decision. This subproposition is denied.

¶ 40 In Proposition VII Fitzgerald claims the trial court's failure to conduct a *Wallace* hearing, in light of his failure to introduce any mitigation in the penalty phase of trial, requires a new sentencing hearing. Fitzgerald presented no mitigating evidence.[61] This Court held in *Wallace v. State*[62] that a defendant may waive his right to present mitigating evidence only after a mandatory hearing by the trial court in which the court (a) finds the defendant has the capacity to understand the choice be-

---

**59.** One can only assume the State recognizes this, as it does not respond to the Supreme Court cases at all and merely cites cases regarding authentication of documents which is not the issue here.

**60.** *Bryan*, 935 P.2d at 364.

**61.** The State mistakenly argues that Fitzgerald did present mitigating evidence. Three times the trial court noted Fitzgerald chose not to present mitigating evidence. The State's argument is based on Instruction 7, which listed mitigating factors gleaned from evidence presented in the first stage. The existence of an instruction listing mitigating factors is separate from the question of whether Fitzgerald introduced mitigating evidence in the second stage of trial. He did not.

**62.** 1995 OK CR 19, 893 P.2d 504, 508, 512–13, *cert. denied*, 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 160.

tween life and death and to knowingly and intelligently waive his right to present mitigating evidence and (b) questions the defendant on the record about his knowledge and understanding of mitigating evidence and its role in the capital sentencing process. No *Wallace* hearing was held, and the entire trial record does not indicate the trial court ever questioned or advised Fitzgerald regarding his knowledge or understanding of the importance of mitigating evidence (including the hearing in which Fitzgerald waived his right to counsel). *Wallace* did not indicate whether failure to hold this hearing requires automatic reversal. We believe this error is analogous to trial error, rather than being structural in nature, and is thus subject to harmless error review.[63] *Wallace* set forth a mandatory procedure to ensure that a defendant understood and intelligently waived this right, but, as with other questions of waiver, our focus is on the nature of the defendant's understanding rather than the form in which it is presented. We reiterate that a *Wallace* hearing is mandatory. However, if, from the record, it is apparent a defendant (a) understands the difference between life and death, (b) understands and appreciates the vital importance of mitigating evidence in capital proceedings, and (c) voluntarily and intelligently waives all right to present mitigating evidence, then failure to hold a *Wallace* hearing may be harmless.

¶ 41 The record does not support such a conclusion in this case. It is apparent Fitzgerald understood the choice between life and death. However, while the record shows Fitzgerald was aware he could call witnesses in mitigation, it is not clear that Fitzgerald understood the purpose or importance of mitigating evidence. After he rested, standby counsel made a record confirming that Fitzgerald chose not to present mitigating evidence because the trial court denied him funds to retain experts who might have effectively presented evidence of his physical and psychological disabilities to the jury (see Proposition II). Fitzgerald's mother was in the courtroom available to testify as a miti-

gating witness, and he was aware he could have called her. Fitzgerald said in closing:

> I've had the opportunity more than once to get up on the stand and open up my whole past to you. I don't know why but I didn't do that. I allowed that not to happen. I feel quite strongly that it should come from me, my past should come from me first, before you heard from Mr. Harris. I was advised that that might not be too smart, and unfortunately I listened to that advice, I think that that was wrong of me. I can't change it.[64]

This admission, plus his failure to call any family member or other person who could speak about him, suggests Fitzgerald did not understand the effect personal information about him could have on the jury's deliberations. As the Supreme Court has often noted, the Constitution requires individualized sentencing,[65] and mitigating evidence is an important factor in ensuring this right. This is why *Wallace* requires such stringent procedures before a defendant may waive his right to present evidence in mitigation. We need not decide whether this murky record would, standing alone, require reversal since in combination with other errors, it necessitates reversal and remand for resentencing on the capital murder charge.

¶ 42 In Proposition IX Fitzgerald argues the trial court by instruction relieved the State of the burden of proof and precluded consideration of mitigating evidence in violation of constitutional provisions. Fitzgerald complains of two instructions in first and second stage, respectively, concerning whether he was under the influence of alcohol at the time of the crimes. In first stage the trial court instructed that voluntary intoxication did not render a person's actions less criminal. In second stage the trial court refused to instruct in mitigation that Fitzgerald was under the influence of alcohol. At trial, the two surviving robbery victims testified Fitzgerald did not appear to be drunk; one said Fitzgerald might have been intoxicated but appeared to know what he was

---

**63.** *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991).

**64.** Trial Transcript at 1183.

**65.** *See, e.g., Lockett*, 438 U.S. at 605, 98 S.Ct. at 2965.

doing. Family and friends with Fitzgerald that night, testifying for the State, variously said he had one beer and was not intoxicated, was slightly drunk, obviously drunk, and pretty drunk.[66] In Fitzgerald's statements to police, admitted at trial, he said he had been drinking tequila and beer all night, was very intoxicated, did not remember a lot of details about the crimes, and had not intended to hurt Russell.

¶ 43 Fitzgerald requested an instruction on voluntary intoxication in the first stage but withdrew the request after the trial court denied him funds for experts.[67] Voluntary intoxication is not a complete defense to malice murder but may be considered in determining whether a defendant had the intent to kill during the commission of the crime.[68] Sufficient evidence must be introduced to show a defendant was so intoxicated his mental powers were overcome and he was unable to form criminal intent.[69] Where the trial court finds insufficient evidence has been introduced to support a voluntary intoxication defense, it is within the court's discretion to either reject an instruction on voluntary intoxication or instruct the jury that voluntary intoxication is not a defense.[70] Here, Fitzgerald withdrew his request for the voluntary intoxication instruction. The State requested an instruction that intoxication was not a defense to the crime, and the trial court agreed stating it felt this instruction was proper given the evidence of intoxication presented. In light of the conflicting evidence presented regarding Fitzgerald's level of intoxication and the amount of detail he recalled in each statement to police, this decision was not clearly an abuse of discretion.

¶ 44 In the second stage Fitzgerald requested the jury be instructed in mitigation that he was under the influence of alcohol at the time of the crimes. Although the trial court found in its Capital Felony Report that there was evidence Fitzgerald was under the influence at the time of the capital offense, it refused to include this as a mitigating circumstance. Fitzgerald claims this omission, coupled with the instruction above (which was incorporated into the second stage proceedings), prevented the jury from considering any evidence of intoxication as mitigating evidence. This argument is persuasive. In *Ledbetter v. State*,[71] we were "puzzled" where a trial court listed a similar factor in its capital felony report but refused to include it in the list of mitigating circumstances submitted to the jury. We held that, in combination with other errors, this required reversal. The State does not discuss *Ledbetter* and simply argues that incorporation of the first stage instructions could not have discouraged any juror from considering all relevant mitigating circumstances. The State argues both that evidence of intoxication was irrelevant and that the jury was not precluded from considering it in mitigation. We fail to see the logic in this argument. The issue is whether, under these instructions, the jury could think evidence of intoxication would be mitigating. The prosecutor argued in the first stage, and the jury was instructed, that intoxication was not a defense to the crime. This instruction applied to the second stage, and no instruction suggested intoxication might be used in mitigation. The trial court agreed that evidence of intoxication was presented. There appears to be no reason to deny Fitzgerald's request that it be included in his sparse list of mitigating circumstances. As in *Ledbetter*, we need not decide whether this error alone would require reversal since in combi-

---

**66.** None of these accounts supported Fitzgerald's claim that he went to several bars with a female friend before committing the crimes.

**67.** Fitzgerald argued tirelessly at trial and on appeal that expert testimony was necessary to explain why his drinking that night, combined with his diabetes and possible residual brain damage from the gunshot wound to his head, would so impair his judgment as to prevent him from forming the intent to kill necessary for malice murder.

**68.** *Edwards,* 655 P.2d at 1051; *Jones,* 648 P.2d at 1255.

**69.** *Jackson,* 964 P.2d at 892.

**70.** *Crawford v. State,* 1992 OK CR 62, 840 P.2d 627, 638.

**71.** 1997 OK CR 5, 933 P.2d 880, 898–99.

nation with other errors, it necessitates reversal and remand for resentencing on the capital murder charge.

¶ 45 In Proposition XVII Fitzgerald argues the cumulative error in this case was, in and of itself, an arbitrary factor that requires reversal. There are five separate serious errors in the sentencing stage. They include errors in jury selection as well as evidentiary errors and the refusal of a factor in mitigation. Any one of these, standing alone, might not require reversal. We need not decide whether these errors are individually reversible because in combination they denied Fitzgerald a fair and reliable sentencing proceeding. The trial was well conducted, and the prosecutor behaved fairly and with propriety. However, in the second stage a *pro se* defendant was unable to life-qualify his jury, was denied experts to assist in presentation of mitigating evidence, chose not to present such evidence without guidance or inquiry from the trial court, was denied the opportunity to rebut evidence of an aggravating circumstance, and was denied the chance to list a circumstance of the crime in mitigation. We were unable to find any of these errors individually harmless beyond a reasonable doubt. Their combination requires reversal.[72] As we must reverse on these issues, we do not address the remaining propositions of error.[73]

STRUBHAR, V.P.J., LANE, J., and JOHNSON, J., Concur.

LUMPKIN, J., Concurs in Results.

LUMPKIN, Judge, concurs in results:

¶ 1 I do not disagree with the result in this opinion which affirms the conviction but remands for resentencing. However, I do disagree with the analysis that is applied

regarding the procedure for request of expert witnesses.[1] I do not believe the mere noting of the provisions of 19 O.S.Supp.1992, § 138.8, is sufficient to address the problems I see with the analysis.

¶ 2 To appreciate and understand the application of this statutory reference, a review of the history of the statute, together with revisions and ultimate repeal of 22 O.S.Supp. 1985, § 464, must be made. From statehood until 1991, Title 22 had contained a Section 464. Up until 1985, that particular section related only to the right to counsel prior to arraignment and provided for compensation of counsel. However, in 1985, Section 464 was amended to address the *Ake*[2] problem. In that amendment, the Legislature created a procedure for an individual charged with a crime where the death penalty could be imposed to apply for an expert witness. That amendment required the trial court to rule on the reasonableness of the request by the defendant for expert witnesses and other services. It also provided for the payment of compensation to expert witnesses out of the state judicial fund in a sum not to exceed $750.00 per defendant, with the specific amount to be determined by the trial judge, subject to the approval of the Chief Justice. In addition, the amendment provided that expenses in excess of $750.00 per defendant could be compensated upon application and approval of the Chief Justice, according to rules promulgated by the Supreme Court. Additionally, it stated that no application for compensation of expert witnesses and other services would be heard by the trial court prior to the final trial disposition. This statute was repealed by Laws 1991, c. 238, § 37, eff. July 1, 1991.

¶ 3 That repealer was at the end of the Indigent Defense Act which created the

---

**72.** The State merely argues in response to this proposition that there can be no cumulative error where no error occurred. This argument ignores the State's own repeated suggestion that error in many of these propositions was harmless.

**73.** Fitzgerald's Application for Evidentiary Hearing And/Or Request to Supplement the Record on Direct Appeal, filed September 29, 1997, is **DENIED**.

**1.** I remain committed to the view expressed in *Rogers v. State*, 890 P.2d 959, 979 (Okl.Cr.1995) (Lumpkin, J. Concur in results) and *Hawkins v. State*, 891 P.2d 586, 599–600 (Okl.Cr.1995) (Lumpkin, P.J. specially concurring) regarding the current scope and applicability of *Ake* in Oklahoma criminal procedure.

**2.** *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

Oklahoma Indigent Defense System. Prior to that time, there had been an Oklahoma Public Defender System which provided only limited services on a statewide basis, and almost all appointments of attorneys for indigent defense at the trial level were made by the District Courts with the attorneys being compensated through the court fund. This Act created a body of new law in formulating the organization of the Oklahoma Indigent Defense System (O.I.D.S.), its Board and Executive Director. A part of that Act provided the Executive Director of O.I.D.S. would determine payment of expert witness services "at a reasonable hourly rate". Exceptions were made for those counties above 200,000 population, according to the federal decennial census of 1960 or any succeeding federal decennial census. The repealer to this Act included Section 464, Title 22. Then in 1992, the Act was amended [3] and expanded the duties of the Executive Director and the Indigent Defense Board. This amendment included the requirement for the payment of expert witnesses as authorized by the Executive Director to be subject to the approval of the Board.

¶ 4 As the opinion notes in footnote 25, we held in *Toles v. State,* 947 P.2d at 187–88, there was no *Ake* violation where the Executive Director failed to approve an attorney's request for a pharmacologist to investigate and develop a voluntary intoxication defense. That provision was a part of the new law, which was added in the 1991 Act. In the 1992 Act, in Section 21, the Legislature added Section 138.8 of Title 19, which states, "in counties subject to the provisions of Section 138.1 of Title 19 of the Oklahoma Statutes, expert witness compensation for indigent defense shall be paid by the Court fund pursuant to procedures established by the governing board of the Court fund." It would

appear, the repealer at the end of the 1991 Act, which repealed Section 464, vacated the only statutory authorization/procedure for the appointment and compensation of expert witnesses. A logical reading of the sequence of events in these Session Laws is that the repealer, which did not provide a vehicle for Oklahoma and Tulsa counties to pay expert witnesses since they were not a part of the Indigent Defense System, was overlooked and subsequently corrected at the first opportunity in the 1992 session.

¶ 5 In the previous provisions of Section 464, the Legislature specifically delegated to the trial court the responsibility to make decisions relating to expert witnesses and their compensation. Likewise, in the 1992 provision, the Legislature specifically said those expert witnesses shall be paid by the Court fund pursuant to procedures established by the governing board of the Court fund. The Legislature did not include the District Court in that process. It seems the logical interpretation, as we look at that 1991–92 session laws revamping the Indigent Defense System, is as we said in *Toles,* the Legislature made a conscious decision that the Indigent Defense System is going to be responsible for its own expenses. 947 P.2d at 187. That applies to Oklahoma and Tulsa counties likewise through the provisions of Section 138.8 of Title 19.[4]

¶ 6 A reading of these statutory amendments reveals that now the Court fund board sets a budget for the Public Defender in Oklahoma and Tulsa counties. The Chief Public Defender is then responsible for managing that budget and remaining within the budgetary authorizations. The Chief Public Defender in Tulsa and Oklahoma counties acts just as the Executive Director of O.I.D.S. acts. The Chief Public Defender receives requests, makes a determination of

---

3. Laws 1992, c. 303, § 5, eff. May 27, 1992.

4. This interpretation is consistent with the limitations on the expenditure of funds set forth in 20 O.S.Supp.1997, § 1304(B)(19). That section provides in pertinent part:

   B. The term "expenses" shall include the following and none others:
   . . .
   19. Reasonable compensation for expert, investigative or other services authorized by the

court for *indigent defendants not represented by a county indigent defender or the Oklahoma Indigent Defense System,* if requested;
   . . . (emphasis added).

This language means that when the defendant is represented by OIDS or Tulsa or Oklahoma County Public Defender, claims for experts witnesses must go through those entities and are not payable from the court fund.

the appropriateness of experts and either authorizes or denies the request for expert witnesses. If an expert is authorized, the Chief Public Defender then sets an amount which may be expended. It is clear this is the legislative intent which can be gleaned from a review of this history of the evolution of O.I.D.S. and the Public Defender Systems.

¶ 7 In this case, Appellant was initially determined to be indigent and counsel from the Tulsa County Public Defender's Office was appointed to represent him. When the trial court granted Appellant's request to represent himself, the Tulsa County Public Defender's Office was directed to serve as stand-by counsel. Appellant then filed his request for a state funded expert witness with the trial court rather than proceeding under Section 138.8. Under the record in this case, it does not appear the District Court of Tulsa County complied with the provisions of Section 138.8 of Title 19. Under the current statutory framework, a judge is not to be involved in authorizing or compensating expert witnesses within the context of the facts presented in this case. That budget is to be established by the governing board of the Court fund for the Public Defender's office. Granted, that Court fund board would consist of a District Judge, Associate District Judge and District Court Clerk of the County as set out in 20 O.S.1991, § 1302. But by its repeal of Section 464 of Title 22, the Legislature has changed the procedure. Because of this change in procedure established by the Legislature, the analysis set forth in *Fitzgerald*, relating to the trial judge, is no longer applicable within the State of Oklahoma. The only time the District Court should become involved in the issue of funding, as it relates to the Public Defender, is if the Public Defender believes insufficient funds have been provided to fulfill his or her statutory and constitutional role. An action could be filed in the District Court to mandamus the providing of those funds. However, other than the sufficiency of the overall budget, the individual decisions relating to the expenditure of those funds is the same for the Public Defender in Oklahoma and Tulsa counties as it is for the Executive Director of O.I.D.S.

¶ 8 It would be appropriate to remand this case to the District Court of Tulsa County to have an Evidentiary Hearing for a record to be made to determine the procedure being utilized in Tulsa County and if Tulsa County has complied with this statutory provision. If Tulsa County has not complied with the statutory provision, then this Court would have an evidentiary base upon which to make findings and enter directives as a part of our remand for resentencing. We should give serious consideration to this issue regarding the application of the specific statutory revisions in this case rather than the general statements of our belief of what should be done under *Ake*. As we set out in *Banks v. State*, 953 P.2d 344, 346–47 (Okl.Cr. 1998), if our decision on an issue is not a violation of the federal Constitution, then regardless of whether it is right, wrong or another Court would have done it different, it should be followed and applied. The same is true as to our role in applying legislative enactments. Regardless of whether we might have done it different, if the Legislature has provided a constitutional vehicle for addressing the issue of authorization and funding for expert witnesses, then we are required to apply that procedure.